FILED

IN THE UNITED STATES FEDERAL DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA   2014 FEB 28  P 1:42
ALEXANDRIA DIVISION

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| Monica Guessous | ) |
| 16 South Van Dorn Street | ) Case No.: 1:14CV224 |
| Fairfax, VA 22034 | ) GBL/IDD |
|     Plaintiff, | ) Civil Complaint for Violation of Title VII 42 |
| | ) U.S.C. § 2000 et seq; & 42 U.S.C. |
|     vs. | ) § 1981. |
| Fairview Property Investments, LLC. | ) |
| 2941 Fairview Park Drive | ) Jury Demand |
| Falls Church, VA 22042 | ) |
|     Defendant. | ) |
| | ) |
| | ) |

## INTRODUCTION

Plaintiff Ms. Monica Guessous by and through her undersigned attorney bring this action

for religious, national origin and pregnancy discrimination, harassment and hostile work

environment, and retaliation as under Title VII 42 U.S.C. § 2000 (e) *et seq.,* and for race

discrimination (Arab)[1], hostile work environment, harassment and retaliation as under Section

1981 against the defendant employer Fairview Property Investments LLC (FPI).

Ms. Monica Guessous is an Arab-American Muslim female. On February 11, 2007, she

began her employment with FPI as a "Bookeeper/Assistant Property Manager" overseeing the

commercial properties of FPI. FPI is a commercial landlord.  She earned $45,000 per year.

For all seven (7) years of her employment, up to the time of her termination on March 1,

2013, she was deemed a model employee by FPI. To the best of our knowledge, she was never

disciplined, reprimanded or provided a negative performance evaluation by FPI.

---

[1] *See St. Francis College v. Al-Khazraji,* 481 U.S. 604 (1987) (Section 1981 claims applies to Arabs).

Around September or October 2009, FPI hired Mr. Greg Washenko, an American Christian Caucasian male, as their Chief Financial Officer (CFO). Ms. Guessous reported directly to him. Almost immediately Mr. Washenko began making derogatory, stereotypical and harassing comments about Muslims, Arabs and Islam to Ms. Guessous.

For instance, soonafter his appointment as CFO, or late 2009, Mr. Washenko called Ms. Guessous into his office as part of his "meet and greet session", asked about her racial and national background,  how long she was in the country and where she had worked in the past. To the best of our knowledge, this information was not enquired of other FPI employees, who were not Muslim, Arab or from the Middle East.

Ms. Guessous informed Mr. Washenko that she was from Morocco and of Middle Eastern or Arab heritage. He then replied that he had worked with Middle Easterners in the past when he shipped some computer equipment and that they are all a bunch of crooks and con men, who will stop at nothing to rip you off. Having taken aback at the comment, she simply replied, "Greg, in the world we live in, crooks are everywhere."

His initial comments and stereotypes about Muslims and Arabs were only a beginning of other intentional and purposeful discriminatory comments, unwelcomed harassment and behavior (further alleged below) that would continue unabated for the next several years. In Winter 2011 or Spring 2012, he also informed FPI staff, that his sole Muslim employee (the Plaintiff) tried to poison him. This continued harassment made Ms. Guessus self-conscious of her race, religion and ethnicity to the extent that she felt insecure in communicating about work matters with FPI staff and clients. Mr. Washenko also started keeping regular tabs on her, in that he would frequently step out of his office, slowly walk to the desk of Ms. Guessous and with his

hands on his hips, observe her at work and other duties.  Once again, this surveillance by Mr. Washenko was not experienced by other employees of FPI.

In July 2012, Ms. Guessous requests three (3) months of maternity leave from Mr. Washenko. He expresses frustration with her and enquires why she needs 3 months of maternity leave, when a previous employee of his was satisfied with a week's maternity leave.  She says that she is entitled to it under the law and she plans on taking the full 12 weeks of maternity leave. Mr. Washenko again cautions her and that were she to do so, it would be unpaid leave.

Ms. Guessous is on maternity leave from August 2012 – October 2012 or 3 months.

Upon her return from maternity leave, Mr. Washenko withdraws all work assignments from her and assigns her work duties to Ms. Karen Diaz and Ms. Tara Berger, two non-Muslim, non-Arab, American females, who also did not seek maternity leave and who to the best of our knowledge may not be qualified to do accounting and/or bookkeeping tasks, as they had no prior training on these matters. Ms. Guessous was employed for 7 years at FPI as their sole bookkeeper. This is only buttressed by the fact, that upon her return her colleague Ms. Diaz around November/December 2012 informs her that "it was chaotic when you were away, we need you here."

On December 6, 2012, Ms. Guessous informs Mr. Washenko that she needs her job assignments and prior duties back, or that she be trained to perform other meaningful functions and assignments. She then engaged in protected activity by verbally complaining to Mr. Washenko about his past prejudicial comments, and that she feels that she was being targeted by him because she was a female Muslim of Arab heritage and that she had requested maternity leave.  She then informs him, that she hopes that he can look past their differences and that he

treats her like an equal, and that he not judge her simply because she was a Muslim, and he happens to hate Muslims and Arabs.

In January 2013, she again asks for the return of her old duties and assignments. Mr. Washenko promised to talk to her about this, but never does.

The next communication from Mr. Washenko was on March 1, 2013, wherein she was informed that she was being terminated because of the company's financial difficulties and that FPI are unable to keep her further employed. Ms. Guessous asks Mr. Washenko how was it that the finances of the company have changed, since as the bookkeeper/accountant she was well versed with the company's finances and that FPI was on track to make another year of record profits.

Mr. Washenko angrily replied, "Monica, do not argue, there simply is not enough work for you here!" He then immediately offered her a severance agreement to sign, waiving all her Title VII and other employment law rights, along with two (2) months of salary in consideration for signing the severance agreement. She refused to sign the severance agreement and was subsequently terminated.

On March 5, 2013, Ms. Guessous, files a charge (Form 5) with the Equal Employment Opportunity Commission (EEOC) alleging discrimination and retaliation as under Title VII and the Pregnancy Discrimination Act. On December 3, 2013, the EEOC issued a Right to Sue. This action now follows.

## PART I. PARTIES

1. Plaintiff Ms. Monica Guessous is a female Arab-American citizen from Morocco. She is also a practicing Muslim. She is married to an American citizen and is a mother of two children. She obtained her Bachelors in Science from the *Academie de Bordeaux*, in Casablanca, Morocco. She is fluent in French and Arabic. In 2007 Ms. Guessous began

her employment with Fairview Property Investments LLC as a Bookeeper/Assistant Property Manager. She was terminated by her supervisor and Chief Financial Officer Mr. Greg Washenko and FPI on March 1, 2013.

2. Fairview Property Investments LLC (FPI) engages in leasing and selling real estate properties. Its properties include office and retail space. The company is based in Falls Church, Virginia. FPI is an employer under 42 U.S.C. § 2000(e) *et seq.*

## PART II. JURISDICTION & VENUE

3. This Court has jurisdiction of this action under 28 U.S.C. §1331, 28 U.S.C §1343 (4) and 42 U.S.C. §2000(e)-(5) f in order to protect rights guaranteed by 42 U.S.C §1981, and Title VII of the 1964 Civil Rights Act, 42 U.S.C. §2000 (e) *et.seq.*

4. Venue is proper in this Court because both the plaintiff and the defendant are within this Court's jurisdiction, the plaintiff was also employed and terminated by FPI while working at the FPI office located at Falls Church, Virginia.

## PART III. EXHAUSATION OF ADMINISTRATIVE REMEDIES

5. On March 5, 2013 Ms. Guessous filed her charge (Form 5) with the Equal Employment Opportunity Commission (EEOC) alleging discrimination as under the protected categories of: sex, religion, national origin and retaliation. The charge number is: 570-2013-00951

6. On March 20, 2013, we emailed the EEOC a detailed eight (8) page letter elaborating her allegations of discrimination, harassment, hostile work environment and retaliation against FPI, and that this letter be added as an addendum to her charge. A copy was also sent to FPI legal counsel.

7.  On April 9, 2013, Ms. Guessous amended the aforementioned charge, to also allege race (Arab) discrimination.

8.  On September 3, 2013, FPI Legal Counsel mails a ten (10) page letter to the EEOC and that Ms. Guessous' EEOC charge be dismissed because she is unable to show any violation of Title VII as under the laws for discrimination, hostile work environment and retaliaton.

9.  Specifically they alleged that amongst things, there is no direct evidence of discrimination.

10. On December 3, 2013, the notice of the Right to Sue is issued by the EEOC.

11. On February 28, 2014, an action was timely filed with this Court within the 90 day period of filing suit as under 42 U.S.C.§ 2000(e)-5(f)(1).

12. Ms. Guessous has no further administrative obligations.

## PART IV. STATEMENT OF FACTS

13. Ms. Guessous began her employment with FPI on February 11, 2007. At all times of her employment with FPI, she was FPI's only Muslim and Arab employee of Moroccan heritage. She was employed as a Bookkeeper/Assistant Property Manager at an annual salary of $45,000. At the time of her termination on March 1, 2013, she was earning $47,500 per year.  For her entire tenure at FPI, Ms. Guessous was considered a model employee and to the best of our knowledge, there are no instances, of a write up, or a negative performance evaluation against Ms. Guessous.  Upon information and belief, she was also the only Bookkeeper at FPI, if not also the only "Assistant Property Manager." As of the date of this filing, she is unemployed.

14. As part of her duties, she would engage in vendor processing, loan adjustments, accounts payable, accounts receivable, bank reconciliations, collection calls to delinquent accounts, management of client accounts, including complete (or 100%) management of the *Pizzeria Orzo* account: for which she would input the sales tax, dollar amounts of food sold, tips earned from the various employees, processing the vendor and liquor invoices; she would also manage the cash updates for the following accounts: (i) FPI; (ii) 2941 Fairview LLC; (iii) 2941 Parkdrive LLC; (iv) 2900 Fairview Parkdrive; and (v) 2900 Fairview LLC[2]

15. At the time of her initial appointment, her immediate supervisor was Mr. Peter Arey. Mr. Arey was the Vice President of FPI. Mr. Arey was an American, Christian, Caucasian male.

16. Ms. Guessous reported to Mr. Peter Arey from February 11, 2007 to about September 2009. Her interaction with Mr. Arey was positive, collegial and professional. Infact she considered him a mentor. There are no instances of discrimination, harassment, hostile work environment and/or retaliation as under Title VII and Section 1981 as against Mr. Arey.

17. On or about September/October 2009, Mr. Arey left his employment with FPI. His replacement was Mr. Greg Washenko and like Mr. Arey, also a Christian, American, Caucasian male. Mr. Washenko was the Chief Financial Officer (CFO) of FPI.

18. Upon information and belief, Mr. Washenko and Ms. Mary Alexander (President of FPI) were colleagues at a previous place of employment; it was also Ms. Alexander that recruited Mr. Washenko for the position.

---

[2]  These tasks were engaged from 2007 to the time of her maternity leave or August 2012. As is further discussed below, upon her return from maternity leave, her duties were reassigned.

19. From September/October 2009 to the day of her termination on March 1, 2013, Ms. Guessous reported to Mr. Washenko.

**Direct or Circumstantial Evidence of Discriminatory Intent from the CFO Mr. Washenko. Statements Made Concerning A Matter Within the Scope of Employment and Admissible Under FRE 801(d)(2)(D)**

20. Almost immediately Mr. Washenko began to intentionally and purposefully target Ms. Guessous by making disparaging, discriminatory and racist comments about her race (Arab), religion (Muslim), and national origin (Morocco and/or Middle East), directed specifically at the Plaintiff Ms. Guessous, only.

21. For instance, soon after his appointment as CFO, or late 2009, Mr. Washenko called Ms. Guessous into his office as part of his "meet and greet session", and started asking her about her ethnic and national background, how long she was in the United States and where she had worked in the past.  To the best of our knowledge, this inquiry was not made of the other employees at FPI.

22. Ms. Guessous informed Mr. Washenko that she was from Morocco and of Middle Eastern or Arab heritage. He then replied that he had worked with Middle Easterners and Arabs in the past when he shipped some computer equipment and that, "they are all a bunch of crooks and con men, who will stop at nothing to rip you off." Having taken back at the comment, she simply replied, "Greg, in the world we live in, crooks are everywhere."

23. Mr. Washenko's initial comments, racial and religious stereotypes were only a beginning of other intentional and purposeful discriminatory comments and behavior towards Ms. Guessous.

24. On December 25, 2009, a suicide bomber of Nigerian and Muslim heritage is apprehended on a Northwest Airlines flight to Detroit. He was attempting to blow up the plane[3]. On January 7, 2010, seven (7) CIA officers were killed in Afghanistan by a suicide bomber[4].

25. In January 2010, Mr. Washenko exits his office, walks towards Ms. Guessous, who is located two feet away and asks, "Why do Muslims hate America?" Ms. Guessous replies that this is not true, and that "Muslims do not hate America" She replies that she is a Muslim, and that she "does not hate America." Mr. Washenko shakes his head and rephrases the question, and asks again, "OK let me rephrase, why do Muslim terrorists hate America?" She replies that she does not know, and also that "Muslims are not terrorists." To which Mr. Washenko retorts by saying, "Sure, but like my buddy says, not all Muslims are terrorists, but most of them are." He then storms and walks away.

26. Ms. Guessous was very upset by this comment, as she perceived that Mr. Washenko saw her as a "Muslim Terrorist."

27. Around this time, he also started addressing Ms. Guessous by her Moroccan name Mounia Guessous. She objected to him calling her by her Arabic name and insisted that he called her Monica, as had always been the case, since the start of her employment with FPI and prior to his arrival. After 2-3 months of repeated requests and protests, he finally started addressing her as Monica.

28. In April 2010, Hamas launched a series of attacks on Israel. On April 3, 2010, a mortar shell launched from the Gaza Strip landed in an Israeli community in the Sha'ar Hanagev

---

[3] See "Nigerian Underwear Bomber Gets Life Sentence."
http://usnews.nbcnews.com/_news/2012/02/16/10427398-nigerian-underwear-bomber-gets-life-sentence?lite (last visited March 16, 2013)
[4] See "Attacker in Afghanistan was a Double Agent." http://www.nytimes.com/2010/01/05/world/asia/05cia.html > (last visited March 16, 2013)

Regional Council.[5] On April 12, 2010, or on Holocaust Memorial Day, Hamas launched another series of rocket attacks on Israel[6]. There was coverage of these events on cable and network news and the internet.

29. Around May 2010, Mr. Washenko again exits his office, and approaches Ms. Guessous and that he would like her input on a matter. Thinking it was a work related question, he instead asks her, "I can never understand the whole suicide bomber thing. The poor Israelis are being killed everyday by terrorist Muslim Palestinians. How do you explain that?" She replies that "Islam prohibits suicide bombings in all forms, and that it also does not condone the killing of the innocents, and that the problems in Palestine and Israel are none of my business."

30. In July 2010, while working late (evening) in the office and with only Mr. Washenko and Ms. Guessous on the floor, Mr. Washenko again approaches Ms. Guessous and begins to have a conversation on Islam and Christianity. Ms. Guessous informs him that the fundamentals between Christianity and Islam are the same, in that they are both Abrahamic religions and that they believe in monotheism. Mr. Washekno looked at her sarcastically and says, "No Monica! We are not the same, you might think we are, but we are not! We do not believe in the same God!" He then storms and walks away.

31. Again like the comment about "Muslim Terrorists" this latter statement about Muslims and Christians being different "persons," can be objectively perceived and was also subjectively perceived by Ms. Guessous as creating a hostile work environment to Arabs, Muslims and those of Middle Eastern descent.

---

[5] See "IDF Attacks 2 Palestinians Near Kissufim." http://www.ynetnews.com/articles/0,7340,L-3871567,00.html (last visited on March 16, 2013).
[6] See "2 Kassam Rockets Landed in West Negev...." http://www.jpost.com/Headlines/Article.aspx?id=172874. (last visited on March 16, 2013)

32. Around this time, Mr. Washenko also started keeping regular tabs on her, in that he would frequently step out of his office, slowly walk to the desk of Ms. Guessous and with his hands on his hips, observe her at work and other duties. This behavior was not experienced by other employees of FPI. This would continue until her return from maternity leave in October 2012.

33. Mr. Washenko's birthday falls on September 11. On September 11, 2010, Ms. Guessous wishes her boss, a happy birthday. Mr. Washenko condescendingly replies, "Thanks; every year I am reminded of the terrorist attack by the Muslims." He then walks away.

34. Soon after this exchange, Ms. Guessous decides to speak about Mr. Washenko's pervasive behavior and unwelcomed harassment because of her race, religion and national origin, to the President of FPI, Ms. Mary Alexander. (As mentioned earlier, both Ms. Alexander and Mr. Washenko were colleagues at a prior place of employment.)

35. Ms. Guessous informs Ms. Karen Diaz, Administrative Assistant to Ms. Alexander of her intention to do so. Ms. Diaz advises Ms. Guessous against this, and warns her that there might be retaliation from Ms. Alexander & FPI were she to discuss this with her, as Ms. Alexander is fond of Mr. Washenko.

36. Fearing for the loss of her employment, she refrains from discussing this matter with Ms. Alexander[7].

37. In November 2010, Ms. Guessous is working on a new project for client "*Pizzeria Orso.*" Five (5) minutes into this new assignment, Mr. Washenko steps out of his office and asks her if she has completed the project. Ms. Guessous informs him that, "No I am not done

---

[7] *See Ocheltree v. Scollon Prods.*, 335 F.3d 325, 335 (4th Cir. 2003) ("If a supervisor cannot or does not adequately resolve an employee's complaint, the employee has the responsibility of complaining to the company president or vice president. This approach seems ill designed to ensure that upper management learns of harassment. The victim must muster the courage to make a second complaint, and she may be more reluctant to register that complaint with a top company official.")

Greg, as I just started this project." Mr. Washenko then looks at his watch, snaps his

fingers and says, "This is not Moroccan time Monica. You need to work faster."

38. Ms. Guessous mentions this incident (of Moroccan time) to Ms. Diaz who confirms the

incident with her because "I heard it too", and also informs Ms. Guessous that she (Ms.

Diaz) informed Ms. Alexander of this episode, and that she (Ms. Diaz) told Ms.

Alexander that this behavior by Mr. Washenko was inappropriate, and that in her

conversation with Ms. Alexander, Ms. Diaz also informed her, that Ms. Guessous may

quit because of her pervasive, continued and unwelcomed harassment by Mr. Washenko

because of her race, religion and national origin.

39. Mr. Washenko's behavior intentionally and purposefully disparaging Arabs, Muslims and

Middle Easterners continues unabated.

40. In November or December 2010, Ms. Guessous processed a request for business cards for

herself. Since she was also reporting to Mr. Washenko and assisted him on all of his daily

financials and meetings, she processed the business cards for "Assistant CFO."  She

thought this title was appropriate, since she was also managing the lease and sale of

commercial properties, and her title in addition to a "Bookkeeper" was also "Assistant

Property Manager."

41. Two (2) weeks later Ms. Guessous asks Mr. Washenko of the status of her business cards.

He calls her into his office, and says that he could not approve her request because an

Assistant CFO requires a Master's degree or training as a Certified Public Accountant,

"but I understand why you would think of yourself as such, since it must be a cultural

thing."

42. Also around this time or November/December 2010, Mr. Washenko for reasons unknown, walked out of his office and asked Ms. Guessous her immigration status, and if she was a U.S. citizen. She replied that she was a permanent resident. At which point Ms. Washenko asks, "how did you obtain your permanent residency?" To which she replied by way of marriage to her husband who is a U.S. citizen. (She is presently an American citizen). To the best of our knowledge, this information was not inquired of other FPI employees.

43. On January 25, 2011, the popular non-violent and civil uprising erupted in Egypt to overthrow President Hosni Mubarak[8].

44. In February 2011, Mr. Washenko walks up to Ms. Guessous and asks her, "Hey what is up with Egypt and why are the Muslims killing people?" Ms. Guessous replies that she is not Egyptian. He then says, "Well you are from the same culture and all, so I thought I would ask you." She again replies that she is not Egyptian and that she knows as much about Egypt and the popular uprising as he does, or from what she has read and seen on the news.

45. Around Spring 2011, Ms. Guessous was reviewing the financial account for FPI commercial tenant, *Pizzeria Orzo.* She noted that financially they were not doing well. She discussed this matter with Mr. Washenko and said that *Pizzeria Orzo* ought to change their menu and also include chicken and beef dishes, because their current offerings of pork dishes only is limiting their clientele. She says that not everyone eats pork, and she is a Muslim and that she does not eat pork and therefore does not visit *Pizzeria Orzo.* Mr. Washenko replies, "Well Monica, We are not interested in that kind of

[8] See "Why 25 January will be a Date Enshrined in the Country's History."
http://www.guardian.co.uk/commentisfree/2011/feb/05/egypt-rebirth-of-a-nation (last visited on March 16, 2013).

clientele at the moment, but I'll be sure to offer your suggestion at the next Orso meeting." He then turned to work on his computer.

46. She felt insulted and self-conscious as she perceived Mr. Washenko's statement of "not interested in that kind of clientele at the moment" as referring to Muslims and individuals of Arab race. She also felt that her suggestions for client improvements would not be taken seriously by Mr. Washenko because she was an Arab and/or Muslim.

47. In July 2011, Mr. Washenko randomly and without reason comments to Ms. Guessous that "in America we call people by their last name." Ms. Guessous replies that, this is true everywhere when one is trying to be formal. And also that here in America, it is more common to address others by their first name. Mr. Washenko retorts, "No! You would not know that, because you are not from here!"

48. From August to September 2011, the Arab uprising in Libya was in full swing, resulting in the death and capture of Libyan dictator Muammar Gaddafi. There was around the clock news coverage of these international events on both cable and network news.

49. Around this time, Mr. Washenko enquires from Ms. Guessous, "Monica, what is up with Libya? Since you happen to be North African and all, perhaps you should know." He then also asked her what the Moroccan people thought of Libyan leader Muammar Gaddafi. She replies that since she is not Libyan, she paid no interest to Muammar Gaddafi or of the news concerning Libya. She also informs him that Moroccans thought Gaddafi was an idiot.

50. On August 30, 2011, Ms. Guessous sends an email to her sister outlining her pervasive or severe, unwelcomed harassment at work, and that she felt that she was being intentionally and purposefully targeted because of her race, religion and national origin. She asks her

sister to speak with her husband, Sherriff Scott Ogden of the Miami Dade Police

Department, and if she had any legal recourse. She concludes this email by saying:

*"I am sick and tired of [being] the 411 for issues relating to a Muslim terrorist and or
Islamic country's national conflicts and or cultural issues or weirdness that he [Mr.
Washenko] is trying to find out about. I feel targeted for my beliefs and my ethnicity and
culture, and for the years I have been in the good [old] united states of America, I have
never felt so inferior to anyone as I am feeling at this point."*

51. Sometime around late or Fall 2011, Mr. Washenko was in the market for a new car. Ms.

Guessous suggested the purchase of a Volkswagen since her mother owned a

Volkswagen, and she deemed them to be reliable and good cars. Mr. Washenko replies,

"of course they are, since that car must have taken a lot of beating from a Moroccan

driver."

52. In late 2011, she is summoned by Mr. Washenko to the basement of the FPI building,

where the 2941 restaurant is located. She is asked to translate *Farsi* from a

Persian/Iranian employee of the restaurant. She replies that she does not speak *Farsi* or

Iranian. Upon his return to his office, Mr. Washenko walks up to Ms. Guessous and says,

"So you don't speak Iranian? Shouldn't there be some secret Muslim language that you

all understand?" "That is ridiculous Greg," Ms. Guessous replied.

53. Also in late 2011, she mentions to Mr. Washenko that a friend of hers lives in Dubai, the

United Arab Emirates (UAE) and that Dubai was a modern, beautiful and clean city. He

retorts, "Well my friend lived there for a year and he hated it and could not wait to come

back; they are just a bunch of camel people over there and he told me he will never go

back." (emphasis added.)

54. Ms. Guessous was horrified and taken aback by his comment of referring to the people of

the Middle East as "camel people" since it is a variation of the term "camel jockey"

objectively considered to be a racial slur[9] and she too subjectively perceived it as a racial epithet.

55. On another occasion in Winter 2011 or Spring 2012, Mr. Washenko informs Ms. Guessous that he did not bring his lunch. In looking at her direction and her food plate, he comments that the tacos on her plate look good. She offered to share her lunch with Mr. Washenko. The next day she was summoned to his office, looking upset and angry he asked "What was in the tacos you gave me yesterday!?" Surprised, she asks "What do you mean Greg?" He replies, "I spent the entire night at the hospital with food poisoning". She replied that it could not be from the tacos, as she too ate the same food and did not fall sick. Mr. Washenko responds disbelievingly: "Well Monica the Doctor thinks otherwise and he asked me who gave me the bad food? I told him a Muslim employee of mine, and Im her boss!" He then said, that the doctor told him, "Well it's clear she tried to kill you." Ms. Guessous angrily replied "Thats not funny Greg," and walked out of his office. An hour later, she sees Ms. Alexander (President of FPI and prior colleague of Mr. Washenko), Roger Smith, Sarah Poole (all employees of FPI) listening to Mr. Washenko's ordeal, and how Ms. Guessous tried to poison him. Ms. Alexander asks Ms. Guessous, "What did you give him Monica?" For the next two (2) weeks, Mr. Washenko talked about his food ordeal and told the story to anyone who would listen, and that Ms. Guessous tried to poison him. He would also inform other

---

[9] See "CAIR: Racial Slurs Used During Attack on Iowa Muslim." An 18-year-old Iraqi refugee and his mother were reportedly assaulted following a recent softball game at Cedar Rapids' Tait Cummings Park by a member of the opposing team. During the game, supporters of the opposing team allegedly shouted racial slurs at the victim and his team members. After the game, the victim was allegedly hit in the jaw by an assailant from the opposing team who shouted slurs such as "raghead," "terrorist" and "camel jockey." The victim's jaw was broken in the alleged assault. The victim's mother was allegedly assaulted by the same person when she tried to defend her son.
http://www.prnewswire.com/news-releases/cair-racial-slurs-used-during-attack-on-iowa-muslim-96687034.html
(last visited on Feb 25, 2014)

employees about the food poisoning in Monica's presence, or when she could hear him[10].

She was embarrassed, shameful, humiliated and hurt in that the other FPI employees now

also perceived her as a "terrorist or murderous Muslim." It also made her self-conscious

about herself, her ability to do her work, interact with other members of the staff and

clients of FPI. On more than one occasion, she would also temporary leave the office

space and cry in silence.

56. On or about Winter 2011/2012[11], Mr. Washenko asked Ms. Guessous to come into his

office, because he had some important news to share with her. He asks her to sit down

and informs her, that her friend a fellow Moroccan, Mr. Rashid Lakroun, who was a

restaurant manager at the FPI building was terminated. She asks him why he was sharing

this information with her, and that Mr. Lakroun was not her friend. He replied: "Well

Monica he got fired and I thought you should know since both of you are from

Morocco." Looking at her directly he then added "he was a very bad guy Monica, the

stuff we found out about him, he was a very bad guy." She replied, "Well that was good,

if you found out he was a bad person, I guess the restaurant took care of the problem, I

still do not see the need of you informing me of this, since I have never spoken to this

guy." Mr. Washenko again, looking at her directly for the third (3rd) time emphasizing the

bad qualities of this Moroccan employee, "Well, he is a bad guy, and I thought you

should know anyway." He then gave her permission to leave his office.

57. The way Mr. Washenko kept emphasizing that Mr. Lakroun was a bad employee,

including his body language and the tone of his voice, made Ms. Guessous feel that Mr.

Washenko was simply confirming with her, that as a Moroccan and fellow Muslim, she

---

[10] Their office space is 2 feet apart.

[11] We are unsure of the date of this conversation.

too was a "very bad employee." Once again, all of the above "first hand[12]" racially charged comments and remarks by the CFO Mr. Washenko was only made to Ms. Guessous and to the best of our knowledge never to any other FPI employee. All of these comments of racial character and purpose also made her conscious about her ability to do her job and interact with FPI clients and staff. It also left her feeling angry, humiliated, hating the color of her skin, uncomfortable and insecure as the only Arab, Moroccan, Middle Eastern, and Muslim women in the workplace[13]. As she would also frequently leave the office space to cry in silence, it further affected her ability to perform her job and duties. She would also return home depressed effecting her interaction with her husband and family. She was also anxious about working, never knowing what racial or religious comment that Mr. Washenko would make further upsetting her and effecting her ability to work and concentrate on work related matters.

**Pregnancy Discrimination & Subsequent Reassignment of Duties and Termination**

58. Around April 2012, Ms. Guessous informs Mr. Roger Smith[14] that she would like to add her husband and upon the birth of her child, her son, to the company's Preferred Provider Organizations (PPO) health insurance plan. Mr. Smith informs her that this would not be a problem, and he simply needs the social security numbers and date of births of her husband and child (upon birth) to add them as dependents to her insurance policy.

---

[12] *Ellis v. CCA of Tenn LLC*, 2011 U.S. App. LEXIS 15524 (7th Cir.2011) (isolated incidents unless extremely serious will not support [Hostile Work Environment] claim; secondhand harassment is less severe than first hand harassment.)

[13] In upholding a jury verdict, for a Hostile Work Environment, the Fourth Circuit in *Ocheltree v. Scollon Prods.*, 335 F.3d 325, 333 (4th Cir. 2003) said, "After a time, Ocheltree was subjected every day to some variety of this offensive conduct, which was humiliating to her personally and to women in general. The harassment became so offensive at times that it drove Ocheltree from the room. It surely made it more difficult for her to do her job. A rational jury could find that a reasonable person in Ocheltree's situation would regard the work environment at Scollon Productions as abusive."

[14] Upon information and belief, Mr. Smith may be the General Manager of the 2941 Restaurant located at the basement of the employer's building. Mr. Smith processes FPI's payroll through *Paychex* and also handles all matters for medical insurance coverage for FPI employees.

59. She provides the information about her husband to Mr. Smith. After waiting a few days, she asks Mr. Washenko if he had heard anything from Mr. Smith about adding her husband and child to her insurance policy. Mr. Washenko says he has not, but that he will enquire from Mr. Smith.

60. When Mr. Smith returns to the office Mr. Washenko proceeds to have a closed door meeting with Mr. Smith. Fifteen (15) minutes later Mr. Washenko informs Ms. Guessous that effective May 1, 2012, they are unable to provide her with the company's current PPO health plan, unless she agrees to pay a higher premium and/or unless she elects the cheaper HMO health insurance plan. Ms. Guessous elects the cheaper HMO health insurance plan. She then asks Mr. Washenko if this change effects all the employees of FPI, in that they too would have to pay higher premiums for the PPO health insurance plan. He says it does.

61. On May 2012, her obstetrics and gynecology (OBGYN) provider informs Ms. Guessous that they are unsure if they will accept her HMO plan. She complains about this to Ms. Diaz (who is married and had both of her children on FPI's PPO Plan) and enquires if there has been any change to her health insurance policy. Ms. Diaz informs Ms. Guessous that both she and Ms. Tara Berger[15] were still under the company's original health insurance PPO plan, and that no one from FPI informed them of a change in health insurance plans or higher payment of premiums for the PPO plan. She was also informed that they were paying the same premium; Ms. Guessous felt angry, humiliated and discriminated against since Mr. Washenko had informed her otherwise[16].

---

[15] Property Manager at FPI.
[16] In *Piraino v. Int'l Orientation Resources Inc.*, 84 F.3d. 270 (7th Cir. 1996), the Court of Appeals held that the employer's benefit policies to disadvantage pregnant employees was afoul of Title VII, when shortly after learning

62. In July 2012, Ms. Guessous requests 3 months of maternity leave from Mr. Washenko. He expresses frustration with her and enquires why she needs 3 months maternity leave, when a previous employee of his was satisfied with a week's maternity leave. She says that she is entitled to it under the law and she plans on taking the full 12 weeks of maternity leave. Mr. Washenko again cautions her and that were she to do so, it would be unpaid leave.

63. Ms. Guessous is on maternity leave from August 2012 – October 2012 or 3 months.

**Reassignment of Duties by CFO Upon Ms. Guessous' Return from Maternity Leave to Two American, Non-Arab Christian Females Who Were Not on Maternity Leave, Further Raises An Inference of Discrimination Under Title VII & § 1981.**

64. Upon the expiry of her maternity leave or October/November 2012, Ms. Guessous returns to work with FPI. She is however never fully welcomed back from maternity leave, and instead experiences a cold and detached response from Mr. Washenko.

65. He also withdraws all of her work assignments from her and assigns her work duties to himself, Ms. Diaz and Ms. Berger: two non-Muslim, non-Arab, Christian American females, who also did not seek maternity leave and who to the best of our knowledge may not be qualified to do bookkeeping tasks, as they had no prior training on these matters. Ms. Guessous was employed for 7 years at FPI as their sole bookkeeper.

66. Upon her return then, she was left with little to no work to do, other than some small menial tasks. Specifically when compared to her varied and numerous tasks outlined earlier above, upon her return, she was only allowed to work on: accounts receivable,

---

about the employee's pregnancy the employer only permitted such leave, when the employee was employed for a full year.

processing checks for the 2941 Fairview Parkdrive account, and was only responsible for 20% of the *Pizzeria Orzo* account.

67. Around this time or November/December 2012, Ms. Guessous also complains to Ms. Diaz (administrative assistant to FPI President Ms. Alexander) that "Greg [Washenko] is not happy to see me back, and I think he wishes I had not returned." Ms. Diaz says, "Don't be silly, he should be relieved that you are back, <u>because it was chaotic when you were away, we need you here.</u>" (emphasis mine).

**Employer's Knowledge of Protected Activity: December 6, 2012.**

68. On December 6, 2012, she informs Mr. Washenko that she needs her job assignments and prior duties back, or that she be trained to perform other functions and assignments.

69. She also verbally complained to Mr. Washenko about his past prejudicial comments, and that she feels that she is being targeted by him because she is a female Muslim of Moroccan and Arab heritage.  She then informs him, that she hopes that he can look past their differences and that he treats her like an equal, and that he not judge her simply because she is a Muslim, and he happens to hate Muslims. While discussing her past experiences she begins to cry – an incident that was witnessed by Mr. Diaz. Ms. Diaz inturn told Ms. Alexnder, that "Greg made Monica cry." Ms. Alexander replies, "I am sure Greg is just doing his job."

70. In January 2013, Ms. Guessous again asked for her old duties and assignments. Mr. Washenko promised to talk to her about this, but never does.

**Employer's Pre-Textual Reason for March 1, 2013 Termination**

71. The next communication from Mr. Washenko was on March 1, 2013, wherein she was informed that she was being terminated because of the company's financial difficulties and that they are unable to keep her further employed.

72. Ms. Guessous asks Mr. Washenko in what way has the finances of the company changed, since as the bookkeeper/accountant she was well versed with the company's finances and that FPI was on track to make another year of record profits.

73. Mr. Washenko became defensive and angrily replied, "Monica, do not argue, there simply is not enough work for you here!" He then receives a text message from his daughter and comments, "My daughter has her first recital at school today and I am playing Mr. Mom. Don't know what to do; any advise? Ms. Guessous looked at him in a bewildered manner. He then proceeded to offer her a severance agreement to sign, waiving all her Title VII and other employment law rights, along with two months of salary in consideration for signing this agreement. She refused to sign the severance agreement.

74. Four (4) days after her termination, or upon her refusal to sign the severance agreement, on March 5, 2013, while Ms. Guessous was sitting unemployed at home, she receives a message on Facebook from Ms. Alenxander (President of FPI) offering assistance with submitting her resume to other potential employers. Ms. Guessous thought her offer was insincere and was simply another ruse to have her sign the severance agreement waiving all her Title VII and employment law rights.

75. Ms. Guessous continues to be unemployed. Her termination from FPI in violation of Title VII and Section 1981, also had a profound impact on her marriage and her relationship with her husband and children. Additionally, the loss of income also resulted in her

collecting government benefits and welfare. It was the first time she had done so. She is

presently seeking therapy at the "Open Heart Counseling Services" to combat the years

of mental torture and abuse inflicted upon her by Mr. Washenko, Chief Financial Officer

at FPI, and the stress caused from the loss of her job. She hates the color of her skin, and

is an individual that is devoid of any self-confidence. What was once a proud individual

happy to be living the American dream (and the desire to complete an accounting degree)

with a middle class job and income, is now a dejected person who is ashamed of her

racial, religious and ethnic identity.

## PART V. CAUSE OF ACTIONS
## COUNT I. DISCRIMINATION AS UNDER § 1981

76. Plaintiff alleges and incorporates all the paragraphs above.

77. Defendant FPI intentionally discriminated against Plaintiff Monica Guessous on account

of her race, Arab, in violation of 42 U.S.C. § 1981 by denying her equal terms and

conditions of employment and/or by terminating her.

78. Plaintiff's discrimination was not experienced by other non-Arab employees of the

Defendant.

79. Defendant's intentionally interfered with Plaintiffs contract of employment

because of their discriminatory animus towards her race. Defendants acted in a willful

and wanton manner and in callous disregard for the federally-protected rights of the

Plaintiff.

80. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered

and is suffering considerable injury, including but not limited to loss of substantial past

and future salary and income, benefits and other privileges and entitlements of

employment, loss of professional status and career enhancing and advancement

opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

81. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT II. HOSTILE WORK ENVIRONMENT & HARASSMENT AS UNDER § 1981

82. Plaintiff alleges and incorporates all the paragraphs above.

83. Defendant FPI created a hostile work environment and/or harassed Plaintiff because of her race, Arab, the offending conduct was unwelcome, was based on her race, was sufficiently server or pervasive when it altered the conditions of her employment and created an abusive work environment and was imputable to her employer FPI.

84. The affirmative defense of *Faragher*[17] and *Ellerth*[18] allows an employer to avoid strict liability for a supervisor's harassment of an employee if no tangible employment action was taken against the employee. Examples of tangible employment action include "discharge, demotion, or undesirable reassignment." *Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 266 (4th Cir.2001).

85. Plaintiff here suffered tangible employment actions from her supervisor and Chief Financial Officer when she was unable to perform her job because of the harassment,

---

[17] *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)

[18] *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742 (1998)

reassigned and/or stripped of all her employment duties and/or when she was subsequently terminated on March 1, 2013. As a result, "vicarious liability is absolute." *Mikels v. City of Durham*, 183 F.3d. 323, 332 (4th Cir. 1999).

86. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

87. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT III. RETALIATION AS UNDER § 1981

88. Plaintiff alleges and incorporates all the above paragraphs.

89. Plaintiff engaged in protected activity and opposition to practices made unlawful under Section 1981 while employed by Defendant.

90. As a result of her protected activity and opposition to practices made unlawful under Section 1981, Plaintiff was subjected to an adverse employment action, upto and including termination.

91. A casual connection exists between Plaintiff's protected activity and the adverse employment actions taken by Defendant.

92. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

93. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT IV. DISCRIMINATION AS UNDER TITLE VII

94. Plaintiff alleges and incorporates all the above paragraphs.

95. Title VII prohibits discrimination on the basis of religion, national origin and pregnancy (sex)

96. Defendant discriminated against the Plaintiff on the basis of religion, national origin and pregnancy in violation of Title VII by denying the Plaintiff equal terms and conditions of employment and/or by terminating her.

97. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past

and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

98. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT V. HOSTILE WORK ENVIRONMENT & HARASSMENT AS UNDER TITLE VII

99. Plaintiff alleges and incorporates all the paragraphs above.

100.     Defendant FPI created a hostile work environment and/or harassed Plaintiff because of her religion and national origin; the offending conduct was unwelcome, was based on her religion and national origin, was sufficiently severe or pervasive when it altered the conditions of her employment and created an abusive work environment and was imputable to her employer FPI.

101.     The affirmative defense of *Faragher*[19] and *Ellerth*[20] allows an employer to avoid strict liability for a supervisor's harassment of an employee if no tangible employment action was taken against the employee. Examples of tangible employment action include

---

[19] *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)

[20] *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742 (1998)

"discharge, demotion, or undesirable reassignment." *Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 266 (4th Cir.2001).

102.     Plaintiff here suffered tangible employment actions from her supervisor and Chief Financial Officer when she was unable to perform her job because of the harassment, when she was reassigned and/or stripped of all her employment duties and/or when she was subsequently terminated on March 1, 2013. As a result, "vicarious liability is absolute." *Mikels v. City of Durham*, 183 F.3d. 323, 332 (4th Cir. 1999).

103.     As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

104.     As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT VI. RETALIATION AS UNDER TITLE VII

105.     Plaintiff alleges and incorporates all the above paragraphs.

106.     Plaintiff engaged in protected activity and opposition to practices made unlawful under Title VII while employed by Defendant.

107.    As a result of her protected activity and opposition to practices made unlawful under Title VII, Plaintiff was subjected to an adverse employment action, upto and including termination.

108.    A casual connection exists between Plaintiff's protected activity and the adverse employment actions taken by Defendant.

109.    As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

110.    As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## VI.RELIEF SOUGHT

WHEREFORE, the Plaintiff Ms. Monica Guessous respectfully requests this Court award economic damages to be proved at trial, and in addition:

A. Enter judgment for the Plaintiff Ms. Monica Guessous against Defendant Fairview Property Investments LLC on all Counts, in an amount no less than one million dollars ($1,000,000.00)

B. Declare that the conduct of Defendant is in violation of Title VII and Section 1981

C. Award Ms. Monica Guessous reinstatement, punitive damages, full back pay and front pay, including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, bonuses', cash awards, loss of retirement savings and benefits and other remuneration and privileges of employment retroactive to the date of any unlawful employment action found to have occurred in this case.

D. Award Ms. Monica Guessous compensatory damages for emotional distress injuries and loss;

E. Award Plaintiff pecuniary and out of pocket expenses;

F. Order Defendant to pay all reasonable attorneys fees, court costs, and expenses incurred by Plaintiff as a result of Defendants' actions and inactions, as well as pre judgment and post-judgment interest; and

G. Order such other equitable and legal relief as the Court deems just and appropriate.

## VII. JURY TRIAL DEMANDED.

Plaintiff demands a jury trial for this action.

Respectfully Submitted,

/s/Todd Lewis
VA Bar No.73732
The Lewis Law Group P.C.
2200 Wilson Boulevard
Suite 102-50
Arlington, Virginia 22201
*Counsel for Plaintiff*
Main (202) 550-9898
Direct (703) 459-9663
Fax (703) 894-2881
Email: todd.lewis@tllgpc.com

/s/A.J. Dhali
Dhali PLLC
D.C. Bar No. 495909
1629 K. Street. NW. Suite 300
Washington D.C. 20006
T: (202) 556-1285
F: (202) 351-0518
Email: ajdhali@dhalilaw.com
*Pro Hac Vice Application To Be Filed*

Friday February 28, 2014