IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

MONICA GUESSOUS,                          )
                                          )
    Plaintiff,                        )
                                          )
    v.                                )    Case No. 1:14-cv-00224-GBL-IDD
                                          )
FAIRVIEW PROPERTY INVESTMENTS,            )
LLC,                                      )
                                          )
    Defendant.                        )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Fairview Property Investments

("Defendant")'s Motion for Summary Judgment (Doc. 27). Plaintiff Monica Guessous

("Plaintiff") brings this civil action against Defendant for race discrimination (Count I), hostile

work environment (Count II), and retaliation (Count III) in violation of 42 U.S.C. § 1981 ("§

1981"), and religious, national origin, and pregnancy discrimination (Count IV), hostile work

environment (Count V), and retaliation (Count VI) in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII").

There are six issues before the Court. The first issue is whether a genuine issue of

material fact exists as to Plaintiff's claim for racial discrimination where Plaintiff alleges that (1)

she was treated differently because of her race, (2) her job duties were assumed by two non-Arab

employees, and (3) she was ultimately terminated when she had historically been performing her

duties satisfactorily.

The second issue is whether a genuine issue of material fact exists as to Plaintiff's claim

for hostile work environment based on race where Plaintiff alleges her direct supervisor, Greg

Washenko, targeted her by making derogatory and discriminatory comments about her race, which were so severe or pervasive as to alter the conditions of her employment.

The third issue is whether a genuine issue of material fact exists as to Plaintiff's claim for retaliation where Plaintiff alleges that (1) she engaged in protected activity when she spoke to her supervisor, Greg Washenko, in December 2012, complaining about his past racially derogatory remarks toward her, and asking that she be given her old job duties back since she had recently returned from maternity leave; (2) within 75 minutes of engaging in protected activity, the President of Fairview Property Investments, LLC, Mary Alexander, sent two emails to outside vendors in an effort to find another job for Plaintiff; and (3) she never regained her old job duties and was ultimately terminated three months after complaining.

The fourth issue is whether a genuine issue of material fact exists as to Plaintiff's claims for discrimination based on her religion, national origin and pregnancy where she alleges that (1) she was treated differently because of her religion, national origin and pregnancy; (2) her job duties were assumed by two non-Muslim, non-Arab, female employees who had not sought maternity leave; and (3) she was ultimately terminated when she had historically been performing her duties satisfactorily.

The fifth issue is whether a genuine issue of material fact exists as to Plaintiff's claim for hostile work environment based on religion and national origin where Plaintiff alleges her supervisor, Greg Washenko, targeted her by making derogatory and discriminatory comments about her religion and national origin, which were so severe or pervasive so as to alter the conditions of her employment.

The sixth issue is whether a genuine issue of material fact exists as to Plaintiff's claim for retaliation where Plaintiff alleges that (1) she engaged in protected activity when she spoke to

2

her supervisor, Greg Washenko, in December 2012 complaining about his past discriminatory and derogatory remarks toward her, and asking that she be given her old job duties back since she had recently returned from maternity leave; (2) within 75 minutes of engaging in protected activity, President of Fairview Property Investments, LLC, Mary Alexander, sent two emails to outside vendors in an effort to find another job for Plaintiff; and (3) she never regained her former duties and was ultimately terminated three months later.

The Court grants Defendant's Motion for Summary Judgment for three reasons. First, Defendant's Motion for Summary Judgment as to Counts I, III, IV, and VI under Title VII and § 1981 are granted because Plaintiff has failed to demonstrate the existence of a genuine issue of material fact that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for discrimination or retaliation. Second, Defendant's Motion for Summary Judgment as to Count II under § 1981 is granted because only one of Greg Washenko's statements can be construed as a racially derogatory comment and Plaintiff cannot establish that one derogatory comment created an environment sufficiently severe or pervasive to alter the conditions of her employment. Finally, Defendant's Motion for Summary Judgment as to Count V under Title VII is granted because the allegations supporting Plaintiff's hostile work environment claim are time barred as they fall outside of the statute of limitations period for Title VII claims.

## I.     BACKGROUND

Plaintiff Monica Guessous brings this civil action against Defendant Fairview Property Investments, LLC for race discrimination (Count I), hostile work environment (Count II), and retaliation (Count III) in violation of 42 U.S.C. § 1981 ("§ 1981"), and religious, national origin,

3

and pregnancy discrimination (Count IV), hostile work environment (Count V), and retaliation (Count VI) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII").

Plaintiff is an Arab-American Muslim woman from Morocco. First Am. Compl. (hereinafter "Compl.") ¶ 1. Defendant leases and sells real estate properties, including office and retail space. Compl. ¶ 2. Defendant hired Plaintiff as a Bookkeeper/Assistant Property Manager on February 11, 2007. Compl. ¶ 13. Plaintiff's job duties included vendor processing, loan adjustments, accounts payable, accounts receivable, bank reconciliations, collection calls to delinquent accounts, and management of client accounts.[1] Compl. ¶ 14. Plaintiff alleges that, throughout the time of her employment with Defendant, she was the only Muslim and Arab employee of Moroccan heritage. Compl. ¶ 13. During the time of her hiring, Plaintiff's immediate supervisor was Peter Arey, the Vice President of Fairview Property Investments, LLC ("FPI"). Compl. ¶ 15. Around October 2008, Arey was replaced by Greg Washenko ("Washenko"), the Chief Financial Officer of FPI.[2] Def.'s Supp. Br. at 3; Def.'s Ex. A (Guessous Dep.) at 281:5-10.

---

[1]     Defendant admits that Plaintiff had responsibility for invoice processing for Pizzeria Orso but denies that Plaintiff worked on the following accounts: (1) 2941 Fairview Park Drive (FPD), (2) 2941 Fairview LLC, (3) 2941 Parkdrive LLC, (4) 2900 Fairview Parkdrive, and (5) 2900 Fairview LLC. Compl. ¶ 14; Answer ¶ 14.

[2]     In her Complaint, Plaintiff states that Washenko was hired around October 2009, but Defendant and Plaintiff's Deposition list the date as around October 2008. Compl. ¶ 17; Def.'s Supp. Br. at 3; Def.'s Ex. A (Guessous Dep.) at 281:5-10.

## A.     Race, Religion, and National Origin Discrimination

Plaintiff alleges that Washenko targeted her by making disparaging, discriminatory and racist comments about her race (Arab), religion (Muslim), and national origin (Morocco and/or Middle East). Compl. ¶ 20.  In October 2008, during their initial "meet and greet session," Washenko asked Plaintiff about her ethnic and national background, how long she was in the United States, and where she had worked in the past.[3]  Compl. ¶ 21. Washenko allegedly stated that he previously worked with Middle Easterners and Arabs, and "they are all a bunch of crooks and con men, who will stop at nothing to rip you off." Compl. ¶ 22.  Plaintiff responded, "Greg, in the world we live in, crooks are everywhere." Compl. ¶ 22.

Plaintiff claims "whenever there was any war, incident or news coverage of suicide bombers, terrorists, or jihadists, [Washenko] would harass [her] about the role of Muslims in these matters and killings." Pl.'s Opp'n Br. at 17.  In January 2010, after reading news stories about Islamic terrorist, Washenko asked Plaintiff, "Why do Muslims hate America?"  Compl. ¶ 25; Answer 25.  Plaintiff alleges she replied, "Muslims do not hate America," and Washenko rephrased his question to "Why do Muslim terrorists hate America?"  Compl. ¶ 25.  Plaintiff alleges she then stated, "Muslims are not terrorists," and Washenko responded, "Sure, but like my buddy says, not all Muslims are terrorists, but most of them are." Compl. ¶ 25.  Around this time, Washenko began addressing Plaintiff by her Moroccan name "Mounia Guessous," to which she objected for the next two to three months. Compl. ¶ 27.  According to Defendant, Washenko attempted to joke around with Plaintiff and another FPI employee by using their formal names but stopped when he was asked to do so.  Answer ¶ 27.

---

[3]     See *id.*

Around May 2012, following a series of Hamas attacks on Israel, Washenko allegedly asked Plaintiff, "I can never understand the whole suicide bomber thing. The poor Israelis are being killed everyday by terrorist Muslim Palestinians. How do you explain that?" Compl. ¶¶ 28, 29. Plaintiff allegedly replied, "Islam prohibits suicide bombings in all forms, and that it also does not condone the killing of the innocents, and that the problems in Palestine and Israel are none of my business." Compl. ¶ 29.

In July 2010, Plaintiff told Washenko that the fundamentals between Islam and Christianity are the same because they are both Abrahamic religions and they both believe in monotheism. Compl. ¶ 30. Washenko allegedly looked at her disbelievingly and said, "No Monica! We are not the same, you might think we are, but we are not! We do not believe in the same God!" and then stormed away. Compl. ¶ 30. Defendant concedes that Washenko and Plaintiff discussed the differences between their religions, but characterizes the conversation as an "intellectual discourse" and denies that Washenko was upset or sarcastic. Answer ¶ 30. Around this time, Plaintiff alleges that Washenko began "keeping regular tabs" on her, by frequently walking slowly to her desk and "with his hands on his hips, observe her at work and other duties." Compl. ¶ 32. She asserts that Washenko did not do this to other employees of FPI. Compl. ¶ 32.

On September 11, 2010, Plaintiff wished Washenko a happy birthday. Compl. ¶ 33. He allegedly replied by stating, "Thanks; every year I am reminded of the terrorist attack by the Muslims," and walked away. Compl. ¶ 33. Plaintiff allegedly told to Karen Diaz, the Administrative Assistant to the President of FPI, Mary Alexander ("Alexander"), that she intends to report Washenko's harassment to Alexander. Compl. ¶¶ 34, 35. Diaz allegedly "warns her that there might be retaliation from Ms. Alexander and FPI were she (Plaintiff) to discuss this

with her (Alexander), as Ms. Alexander is fond of Mr. Washenko." Compl. ¶ 35. Washenko and Alexander were colleagues at a previous place of employment, and Alexander recruited Washenko for his position at FPI. Compl. ¶ 18. Plaintiff claims that she refrained from discussing Washenko's behavior with Alexander because she feared the loss of her employment. Compl. ¶ 36.

In November 2010, Washenko asked Plaintiff whether she was finished with a project she was recently assigned. Compl. ¶ 37. Plaintiff replied that she had just started on the project, and Washenko looked at his watch, snapped his fingers and said, "This is not Moroccan time Monica. You need to work faster." Compl. ¶ 38. Defendant concedes that he made a reference to "Moroccan time" to Plaintiff but claims he immediately apologized after realizing she was upset about the comment, and told her that he was trying to make a play on the phrase "island time." Answer ¶ 37. Plaintiff discussed this conversation with Diaz, whom acknowledged that she heard the comment. Compl. ¶ 38. Diaz allegedly told Plaintiff that she informed Alexander that Plaintiff may quit because of Washenko's behavior. Compl. ¶ 38.

In November or December 2010, Plaintiff placed an order for her own business cards, in which she listed her position as "Assistant CFO." Compl. ¶ 40. Two weeks later, Plaintiff asked Washenko about the status of her business cards. Compl. ¶ 41. Washenko allegedly told her that he could not approve her request because an Assistant CFO requires a Master's degree or training as a Certified Public Accountant, "but I understand why you would think of yourself as such, since it must be a cultural thing." Compl. ¶ 41. Also during this time, Washenko asked Plaintiff about her immigration status and whether she was a United States citizen. Compl. ¶ 42. Defendant asserts that Washenko's inquiry was precipitated by the fact that Plaintiff was

studying for the citizenship exam and, further, that FPI is required by law to inquire about each employee's immigration and citizenship status. Compl. ¶ 42.

In February 2011, Washenko allegedly asked Plaintiff, "Hey what is up with Egypt and why are the Muslims killing people." Compl. ¶ 44. She claims she responded that she was not Egyptian, to which he replied, "Well you are from the same culture and all, so I thought I would ask you." Compl. ¶ 44. Around Spring 2011, Plaintiff suggested to Washenko that one of their commercial tenants, Pizzeria Orso, should offer more than pork dishes to expand its clientele. Compl. ¶ 45. She allegedly told him that everyone doesn't eat pork; specifically stating that she is a Muslim and doesn't eat pork and therefore does not visit Pizzeria Orso. Compl. ¶ 45. Washenko allegedly responded, "Well [Guessous], We are not interested in that kind of clientele at the moment, but I'll be sure to offer your suggestion at the next Orso meeting." Compl. ¶ 45.

In July 2011, Washenko allegedly told Plaintiff, "in America we call people by their last name." Compl. ¶ 47. Plaintiff allegedly responded that this was a formality everywhere and that in America it was more common to address others by their first name. Compl. ¶ 47. Washenko allegedly responded, "No! You would not know that, because you are not from here!" Compl. ¶ 47. Around August or September 2011, Washenko asked Plaintiff, "[Guessous], what is up with Libya? Since you happen to be North African and all, perhaps you should know." Compl. ¶ 49. She replied that since she is not Libyan, she had no interest in Gaddafi or Libya. Compl. ¶ 49.

On August 30, 2011, Plaintiff sent an email to her sister expressing her frustration with Washenko and asking her to speak to her husband, a police officer, about whether she had any legal recourse. Compl. ¶ 50. She concludes her email by stating:

> I am sick and tired of being the 411 for issues relating to a Muslim terrorist and or Islamic country's national conflicts and or cultural issues or weirdness that [Washenko] is trying to find out about. I feel targeted for my beliefs and my

> ethnicity and culture, and for the years I have been in the good old United States of America, I have never felt so inferior to anyone as I am feeling at this point.

Compl. ¶ 50. Around late or Fall 2011, Washenko was shopping for a new car and Plaintiff suggested he purchase a Volkswagen since her mother owned one and she deemed them to be reliable cars. Compl. ¶ 51. Washenko allegedly replied, "of course they are, since that car must have taken a lot of beating from a Moroccan driver." Compl. ¶ 51.

In late 2011, Washenko summoned Plaintiff to the basement of the FPI building where the 2941 restaurant is located. Compl. ¶ 52. Washenko asks her to translate Farsi from a Persian/Iranian employee, but she tells him that she does not speak Farsi. Compl. ¶ 52. After returning to his office, Washenko allegedly tells Plaintiff, "So you don't speak Iranian? Shouldn't there be some secret Muslim language that you all understand?" Compl. ¶ 52. Around late 2011, Plaintiff allegedly mentions to Washenko that her friend lives in Dubai, the United Arab Emirates and that Dubai was a modern and clean city. Compl. ¶ 53. Washenko allegedly responded, "Well my friend lived there for a year and he hated it and could not wait to come back; they are just a bunch of camel people over there and he told me he will never go back." Compl. ¶ 53.

In Winter 2011 or Spring 2012, Plaintiff offered to share her tacos with Washenko during lunch. Compl. ¶ 55. The next day, Washenko allegedly looked angry and asked her, "What was in the tacos you gave me yesterday!?" Compl. ¶ 55. He allegedly told her that he spent the night in the hospital with food poisoning, and the Doctor told him whatever employee gave him the food had "tried to kill [him]." Compl. ¶ 55. Washenko allegedly retold the story "to anyone who would listen" over the next two weeks. Compl. ¶ 55. On more than one occasion, Plaintiff would temporarily leave the office to cry in silence. Compl. ¶ 55.

9

In Winter 2011 or Spring 2012, Washenko told Plaintiff that a Moroccan restaurant manager at the FPI building was terminated. When she asked why he was sharing this information with her, he allegedly replied, "Well [Guessous] he got fired and I thought you should know since both of you are from Morocco," he then added, "he was a very bad guy [Guessous], the stuff we found out about him, he was a very bad guy." Compl. ¶ 56

## B.    Pregnancy Discrimination

Plaintiff learned that she was pregnant in November 2011. Def.'s Supp. Br. ¶ 17; Def.'s Ex. A (Guessous Dep.) at 131:6. Around April 2012, she spoke with FPI employee, Roger Smith, about adding her husband and upon the birth of her child, her son, to the company's Preferred Provider Organization ("PPO") health insurance plan. Compl. ¶ 58. Within the next few days, Smith speaks with Washenko, whom then informs Plaintiff that effective May 1, 2012, FPI would be unable to provide her with the company's current PPO health plan unless she agrees to pay a higher premium and/or elects the cheaper Health Maintenance Organization ("HMO") health insurance plan. Compl. ¶ 59, 60. She elected the HMO insurance plan. Compl. ¶ 60. In May 2012, Plaintiff's obstetrics and gynecology ("OBGYN") provider informed her that they were unsure whether they will accept her HMO plan. Compl. ¶ 61. Plaintiff allegedly complained to Diaz, whom is also married and has her children on FPI's PPO Plan. Compl. ¶ 61. Diaz allegedly informed her that both she and Tara Berger, a property manager at FPI, were still on the company's original health insurance plan, and that no one from FPI informed them of a change in health insurance plans or higher premiums. Compl. ¶ 61.

In July 2012, Plaintiff requested three months of maternity leave from Washenko. Compl. ¶ 62. She alleges that Washenko expressed frustration with her and asked why she needed three months maternity leave when a previous employee of his was satisfied with a

week's maternity leave. Compl. ¶ 62. Plaintiff claims she then told Washenko that she was entitled to twelve weeks maternity leave under the law, and Washenko responded by again cautioning her that if she were to do so it would be unpaid leave. Compl. ¶ 62. Plaintiff took maternity leave for three months from August 2012 until October 2012. Compl. ¶ 63.

Upon returning from maternity leave in October 2012, Plaintiff alleges that she experienced "a cold and detached response" from Washenko. Compl. ¶ 64. She contends that Washenko withdrew all of her work duties from her and assigned them to Karen Diaz and Tara Berger, "two non-Muslim, non-Arab, Christian American females, who also did not seek maternity leave." Compl. ¶ 65. Around November or December 2012, Plaintiff tells Diaz, "[Washenko] is not happy to see me back, and I think he wishes I had not returned." Compl. ¶ 67. Diaz allegedly replied, "Don't be silly, he should be relieved that you are back, because it was chaotic when you were away, we need you here." Compl. ¶ 67.

On December 6, 2012, Plaintiff allegedly told Washenko that she needed her job assignments and prior duties back, or to be trained to perform other functions and assignments. Compl. ¶ 68. She then verbally complained to Washenko about his racial comments. Compl. ¶ 69; Pl.'s Ex. 4 (Washenko Dep.) at 264:10-12. She allegedly told him that she felt targeted by him because she is a female Muslim of Moroccan and Arab heritage but that she hoped he could look past their differences and treat her like an equal. Compl. ¶ 69. Plaintiff alleges that she began to cry during her conversation with Washenko, which Diaz witnessed. Diaz then allegedly told Alexander, "[Washenko] made Monica cry," to which Alexander replied, "I am sure [Washenko] is just doing his job." Compl. ¶ 69. Plaintiff alleges that her conversation with Washenko took place at 10 a.m. Pl.'s Opp'n Br. at 13; *see* Pl.'s Ex. 4 (Washenko Dep.) at 244:6-8. At approximately 11:45 a.m., Alexander wrote the following email to an external employer

11

regarding Plaintiff: "Hi Patrick. I was wondering if you had any need for an admin accounts payable person. I have a wonderful girl that works for me that we simply do not have enough work for right now. Let me know if you have any openings. Mary."[4] Pl.'s Opp'n Br. at 13; Pl.'s Ex. 6. In January 2013, Plaintiff allegedly asked for her old duties and assignments again. Compl. ¶ 70. She claims that Washenko promised to talk to her about it but never did. Compl. ¶ 70.

Plaintiff's next conversation with Washenko took place on March 1, 2013, when he terminated her. Compl. ¶ 71. Washenko allegedly told Plaintiff that she was being terminated due to Defendant's financial difficulties. Compl. ¶ 71. Defendant contends that Plaintiff's position was being eliminated due to lack of work because the company "was not currently building anything, which had dramatically limited the work load." Answer ¶ 71. Plaintiff alleges that she then asked Washenko in what way the company's finances had changes since the company was on track to make another year of record profits. Compl. ¶ 73. Washenko then allegedly became defensive and angrily replied, "[Guessous], do not argue, there is simply not enough work for you here!" Compl. ¶ 73. Plaintiff refused to sign the severance agreement, waiving all Title VII and other employment law rights, which Washenko offered her. Compl. ¶ 74.

Four days after her termination, Plaintiff received a Facebook message from Alexander, offering assistance with submitting her resume to other potential employers. Compl. ¶ 76. Plaintiff claims she refused Alexander's assistance because she interpreted Alexander's offer as a "ruse" to have her sign the severance agreement. Compl. ¶ 77. Plaintiff continues to be

---

[4]     During the hearing on November 14, 2014, Plaintiff produced a copy of a similar email that Alexander sent to a second employer.

unemployed. Compl. ¶ 78. This matter is now before the Court on Defendant' Motion for Summary Judgment.

## II.    STANDARDS OF REVIEW

### A.    Summary Judgment

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Boitnott v. Corning, Inc.*, 669 F.3d 172, 175 (4th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (citations omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Anderson*, 477 U.S. at 247–48).

A "material fact" is a fact that might affect the outcome of a party's case. *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

13

properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## B.    The *McDonnell Douglas* Burden-Shifting Framework

A plaintiff may establish a claim for discrimination in one of two ways. First, she may do so by demonstrating through direct or circumstantial evidence that discrimination against her because of her protected characteristic (e.g., national origin, religion, pregnancy) motivated the defendant's adverse employment action. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). Second, a plaintiff may proceed under the *McDonnell Douglas* burden-shifting framework, whereby the plaintiff, after establishing a prima facie case of discrimination, "demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Id.* at 285 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

The *McDonnell Douglas* burden-shifting framework has been used to evaluate discrimination and retaliation claims under both Title VII and § 1981. *See Harris v. Homes Sales Co.*, 499 Fed. App'x 285, 291 (4th Cir. 2012). First, the plaintiff must prove by a

preponderance of the evidence a prima facie case. *Burdine*, 450 U.S. at 252-53. Establishing a prima facie case "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id.* at 254.

Second, if the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the decision to terminate the plaintiff. *Burdine*, 450 U.S. at 253 (citing *McDonnell Douglas*, 411 U.S. at 802); *Lockheed*, 354 F.3d 277, 298 (4th Cir. 2004). The defendant's burden is one of production, not persuasion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). It can involve no credibility assessment, that is, the defendant does not need to persuade the court that it was actually motivated by the proffered reasons as long as those reasons, if believed by the jury, would be legally sufficient to justify a judgment for the defendant. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). If the defendant meets its burden of production, the presumption raised by the prima facie case is rebutted. *Burdine*, 450 U.S. at 255.

Third, if the defendant satisfies its burden of production, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253 (citing *McDonnell Douglas*, 411 U.S. at 804). This burden merges with the plaintiff's ultimate burden of persuading the court that she was a victim of intentional discrimination. *Id.* at 256.

## III.    ANALYSIS

The Court GRANTS Defendant's Motion for Summary Judgment in its entirety. Plaintiff alleges the following instances of discrimination and harassment occurred during her employment at FPI:

15

| Date | Alleged Discriminatory Harassment |
|------|-----------------------------------|
| Feb. 11, 2007 | Defendant hires Plaintiff. Compl. ¶ 13. |
| Oct. 2008 | Washenko becomes Plaintiff's direct supervisor. Compl. ¶ 17. |
| Oct. 2008 | During Washenko's "meet and greet" with Plaintiff, he tells her that he previously worked with Middle Easterners and "they are all a bunch of crooks and con men, who will stop at nothing to rip you off." Compl. ¶ 22. |
| Jan. 2010 | Washenko asked Plaintiff, "Why do Muslims hate America?" Compl. ¶ 25. |
| Jan. 2010 | Washenko started addressing Plaintiff by her Moroccan name, "Mounia Guessous," and continues to do so for 2-3 months, despite her protests. Compl. ¶ 27. |
| **Feb. 28, 2010** | **Section 1981 Statute of Limitations clock starts (4 years).[5]** |
| May 2010 | Washenko told Plaintiff, "I can never understand the whole suicide bomber thing. The poor Israelis are being killed every day by terrorist Muslim Palestinians. How do you explain that?" Compl. ¶ 29. |
| July 2010 | Washenko and Plaintiff discuss Islam and Christianity. Plaintiff tells Washenko that the two religions are similar, and Washenko says, "No Monica! We are not the same, you think we are, but we are not! We do not believe in the same God!" Compl. ¶ 30 |
| July 2010 | Washenko began keeping regular tabs on Plaintiff, by slowly walking to her desk and with his hands on his hips, observe her working. Compl. ¶ 32. |
| Sept. 11, 2010 | Plaintiff wishes Washenko a happy birthday and he replied, "Thanks; every year I am reminded of the terrorist attack by the Muslims." Compl. ¶ 33. |
| Nov. 2010 | Washenko checks up on the status on Plaintiff's assignment. When she tells him that she is just getting started, he replied, "This is not Moroccan time Monica. You need to work faster." Compl. ¶37. |
| Nov. 2010 | Plaintiff requested her own business cards, and listed her position as "Assistant CFO." Washenko tell her that he could not approve her request because that position requires a Master's degree, and then states, "but I understand why you would think of yourself as such, since it must be a cultural thing." Compl. ¶ 41. |
| Nov./Dec. 2010 | Washenko asks Plaintiff about her immigration status and whether she is a U.S. citizen. Compl. ¶ 42. |
| Feb. 2011 | Washenko asks Plaintiff, "Hey what is up with Egypt and why are the Muslims killing people?" Compl. ¶ 44. |

---

[5]    The parties identify different cut-off dates for the § 1981 statute of limitations. Defendant lists March 28, 2010 as the cut-off date, while Plaintiff asserts that § 1981 provides a remedy for "all acts from 2009 to March 1, 2013." Def.'s Supp. Br. at 11; Pl.'s Opp'n Br. at 10. Section 1981 has a four-year statute of limitations from the date the Complaint is filed (February 28, 2014). Therefore, the four-year statute of limitations for Plaintiff's § 1981 claim begins on February 28, 2010. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); *see also Johnson v. Portfolio Recovery Associates, LLC*, 682, F. Supp. 2d. 560, 586 ("Plaintiff filed suit on November 24, 2008, so any discrete discriminatory conduct which occurred on or after November 24, 2004 may be covered under § 1981.").

| | |
|---|---|
| Spring 2011 | Plaintiff suggests that one of Defendant's tenants should offer dishes other than pork to expand their clientele to people who, like her (because she is Muslim), don't eat pork. Washenko responds: "Well Monica, We are not interested in that kind of clientele at the moment, but I'll be sure to offer your suggestion at the next Orso meeting." Compl. ¶ 45, 46. |
| July 2011 | Washenko tells Plaintiff, "in America we call people by their last name." She responds that is true everywhere and it is more common in the US to address people by their first name. Washenko responds, "No! You would not know that, because you are not from here!" Compl. ¶ 47. |
| Aug./Sept. 2011 | Washenko asks Plaintiff, "Monica, what is up with Libya? Since you happen to be North African and all, perhaps you should know." Compl. ¶ 49. |
| Fall 2011 | Since Washenko was in the market for a new car, Plaintiff suggests he purchase a Vokswagen since her mother owned one and deemed them reliable cars. Washenko replies, "of course they are, since that car must have taken a lot of beating from the Moroccan driver." Compl. ¶ 51. |
| Late 2011 | Washenko asks Plaintiff to translate Farsi. When she tells him she doesn't speak Farsi, he said, "So you don't speak Iranian? Shouldn't there be some secret Muslim language that you all understand?" Compl. ¶ 52. |
| Late 2011 | Plaintiff mentions to Washenko that her friend lives in Dubai, and it is a modern and clean city. He responds, "Well my friend lived there for a year and hated it and could not wait to come back; they are just a bunch of camel people over there and he told me he will never go back." Compl. ¶ 53. |
| Winter 2011/Spring 2012 | Plaintiff shared her tacos with Washenko for lunch. The next day he tells her he was in the hospital all night. She tells him it could not have been from the tacos, and he says, "Well Monica the Doctor thinks otherwise and he asked me who gave me the bad food? I told him a Muslim employee of mine, and I'm [sic] her boss!" He said the Doctor then told him "Well it's clear she tried to kill you." Compl. ¶ 55. |
| Winter 2011[6] | Washenko tells Plaintiff that a Moroccan employee of a building tenant was terminated. She asked why he was telling her this when she didn't know the guy. Washenko responded, "Well Monica he got fired and I thought you should know since both of you are from Morocco." Then he added, "He was a very bad guy Monica, the stuff we found out about him, he was a very bad guy." Compl. ¶ 56. |
| **May 9, 2012** | **Title VII Statute of Limitations clock starts (300 days).** *See* Def.'s Supp. Br. at 10. |
| July 2012 | Plaintiff discusses maternity leave with Washenko. Compl. ¶ 62 |
| Aug. 2012 – Oct. 2012 | Plaintiff took maternity leave for three months. Compl. ¶ 63 |
| Dec. 6, 2012 | Plaintiff informs Washenko that she wants her former job assignments back or |

---

[6]     Plaintiff is unsure of the date of this conversation, but believes that it occurred in "Winter 2011/2012." Compl. ¶ 56. Defendant contends the date as "Winter 2011." Def.'s Supp. Br. at 13; Def.'s Ex. A (Guessous Dep.) at 277:3-8 (stating that the last verbal instance, "like when he would mention something about Muslims and such," was in late 2011.)

| | to be trained to perform other assignments. She also verbally complained to Washenko about his past racial comments. While discussing her past experiences, she beings to cry. Compl. ¶ 68, 69. |
|---|---|
| January 2013 | Plaintiff again asks for her old job assignments. Washenko promised to talk to her about this but never does. Compl. ¶ 70. |
| March 1, 2013 | Plaintiff is terminated. Compl. ¶ 71. |
| March 5, 2013 | Plaintiff files charge with EEOC. *See* Compl. ¶ 5. |
| Dec. 3, 2013 | A notice of Right to Sue is issued by the EEOC. *See* Compl. ¶ 10. |
| February 28, 2014 | Plaintiff files her Complaint for Violation of Title VII and § 1981. *See* Compl. ¶ 11. |

## A.    Local Rule 56(B)

As a preliminary matter, the Court takes up the issue of whether Plaintiff has failed to comply with Local Rule 56(B) in her Opposition to Defendant's Motion for Summary Judgment (Doc. 27). A party's failure to comply with the Eastern District of Virginia's Local Rule could complicate the district court's factual determination. *Rogers v. Stem*, No. 13-1923, 2014 WL 5753656, at *4 (4th Cir. Nov. 6, 2014). Specifically, Plaintiff has failed to "cit[e] the parts of the record relied on to support the listed facts as alleged to be undisputed" in Plaintiff's Statement of Material Facts in Dispute in Opposition to Defendant's R.56 Motion. *See* Local Civil Rule 56(B). Rather, Plaintiff has either cited to the Complaint or altogether failed to include a citation in support of her allegations.

The Court refuses to consider Plaintiff's self-serving statements as evidence to create a dispute of material fact because "allegations contained in a complaint are not evidence, and cannot defeat a motion for summary judgment." *See Cambridge Capital Group v. Pill*, 20 Fed. App'x 121, 124-25 (4th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . . ."). Where a

plaintiff has not properly supported her factual allegations, the court has proceeded by considering the defendant's facts as undisputed for purposes of the motion and assessed whether the defendant was entitled to summary judgment based on those undisputed facts. *See Anglinmatumona v. Micron Corp.*, No. 1:11-cv-572, 2012 WL 1999489, at * 4 (E.D. Va. June 4, 2012) (citing Fed. R. Civ. P. 56(e)(2)-(3); Local Civil Rule 56(B)). Although Plaintiff has failed to cite to the record in Plaintiff's Statement of Material Facts in Dispute in Opposition to Defendant's R.56 Motion, she has cited to the record in her Opposition Brief. The Court finds this to be in violation of Local Civil Rule 56(B) but will nevertheless proceed to assess the merits of Plaintiff's claims.

**B.    Section 1981**

   **1.    Race Discrimination (Count I)**

The Court GRANTS Defendant's Motion for Summary Judgment on Count I because Plaintiff has failed to demonstrate the existence of a genuine issue of material fact that Defendant's proffered reason for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for racial discrimination under § 1981. Since Plaintiff does not offer any direct evidence of discrimination, the Court will apply the *McDonnell Douglas* burden-shifting framework to evaluate her claim.

To establish a prima facie case for racial discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she suffered from an adverse employment action; (3) at the time the defendant took the adverse employment action, she was performing her duties at a level that met the defendant's legitimate expectation; and (4) the position remained open or was filled by a similarly qualified applicant outside of the protected class. *See McDonnell Douglas*, 411 U.S. at 802; *Harris*, 499 Fed. App'x at 291-92.

The Court finds that Plaintiff has established a prima facie case for racial discrimination. It is undisputed that Plaintiff is a member of a protected class (Arab), that her termination constitutes an adverse employment action, and that she was performing her duties satisfactorily at the time of her termination. In reduction of force cases, the fourth element can be satisfied by demonstrating that persons outside of the protected class were retained in the same positions or by producing evidence indicating that the employer did not treat the protected characteristic neutrally. *See EEOC v. Western Elec. Co., Inc.*, 713 F.2d 1011, 1015 (4th Cir. 1983). Here, Plaintiff argues that members outside of the protected class were retained because Diaz and Berger, two non-Arab, non-Muslim female employees, were retained and assumed her job assignments.

The burden then shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. Defendant has met its burden of production by alleging that Plaintiff was terminated because her position was eliminated due to lack of work. *See* Answer ¶ 71; *Rowe v. Marley Co.*, 233 F.3d 825, 830-31 (4th Cir. 2000) (valid reduction in force is a legitimate non-discriminatory reason for an adverse employment action).

Although the first two prongs of the *McDonnell Douglas* burden-shifting framework are satisfied, Plaintiff has failed to demonstrate a genuine issue of material fact that Defendant's legitimate, non-discriminatory reason for terminating her employment was a pretext for racial discrimination. Plaintiff makes three arguments in support for her claim that Defendant's reason for her termination was pretext: (1) the decision to terminate her was finalized 75 minutes after she engaged in protected activity, (2) no one else was terminated for the reasons provided by Defendant, and (3) she was terminated by her aggressor. *See* Pl.'s Opp'n Br. at 23. None of these assertions, however, could lead a reasonable jury to conclude by a preponderance of the

evidence that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for racial discrimination. *See Reeves*, 530 U.S. at 143; *see also King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003) (affirming summary judgment because none of plaintiff's allegations contradicted employer's proffered discharge motive). Plaintiff has not produced any evidence that her former position was reinstated after her termination. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's racial discrimination claim under § 1981 (Count I).

## 2.     Hostile Work Environment (Count II)

The Court GRANTS Defendant's Motion for Summary Judgment on Count II for two reasons. First, only one of Washenko's statements can be construed as a racially derogatory comment.    Second, Plaintiff cannot establish that the one derogatory comment created an environment sufficiently severe or pervasive to alter the conditions of her employment.

A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 21 (1993) (internal quotations marks and citations omitted).  To prevail on a hostile work environment claim based on race under § 1981, a plaintiff must show that the offending conduct was (1) unwelcome, (2) based on her protected characteristic, (3) sufficiently severe or pervasive that it altered the conditions of her employment and created an abusive work environment, and (4) imputable to the defendant.  *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001) (citing *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998)).

In determining whether the harassment was sufficiently severe or pervasive to establish a hostile work environment, courts consider the totality of the circumstances. *Spriggs*, 242 F.3d at 184 (citing *Forklift*, 510 U.S. at 23). The "severe or pervasive" element of a hostile work environment claim includes "both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (citing *Forklift*, 510 U.S. at 21-22). First, the plaintiff must demonstrate that she "subjectively perceive[d] the environment to be abusive." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 318 (4th Cir. 2008) (quoting *Forklift*, 510 U.S. at 21-22). Next, the plaintiff must show that the conduct was such that "'a reasonable person in the plaintiff's position' would have found the environment objectively hostile or abusive." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)).

The "severe or pervasive" objective inquiry includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Forklift*, 510 U.S. at 23. For example, in *Amirmokri v. Baltimore Gas & Electric Co.*, the Fourth Circuit found that the alleged harassment was sufficiently severe or pervasive where an Iranian plaintiff was called "names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf'" on an almost daily basis for six months, which resulted in his development of an ulcer and subsequent resignation. 60 F.3d 1126, 1131 (4th Cir.1995). Similarly, in *Spriggs,* the Fourth Circuit found that "frequent and highly repugnant insults" made by a supervisor on a "continuous daily basis," in which he called numerous African-American employees "monkey[s]," "dumb monkey[s]," and "ni**** ," were "sufficiently severe or pervasive (or both) to cause a person of ordinary sensibilities to perceive that the work atmosphere . . . was racially hostile." 242 F.3d at 182, 185.

Alternatively, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). An employer cannot "lightly be held liable for single or scattered incidents." *Sunbelt Rentals*, 521 F.3d at 318; *see Skipper v. Giant Food Inc.*, 68 Fed. App'x 393, 398 (4th Cir. 2003) (finding that a manager who harassed the plaintiff by following him around, referred to him by a racial slur on one occasion, and exposed him to racial graffiti daily, is insufficient to constitute a severe or pervasive hostile work environment); *Hampton v. J.W. Squire Company, Inc.*, No. 4:10CV00013, 2010 WL 3927740, at * 3 (W.D. Va. Oct. 5, 2010) (finding that a supervisor's use of the word "ni****" three times in the course of one conversation is insufficient to constitute an abusive atmosphere).

Plaintiff has sufficiently alleged that the harassment was unwelcome. Plaintiff asserts that on numerous occasions she told Washenko that she found his statements offensive and also mentioned her concern to Diaz. *See Sunbelt Rentals*, 521 F.3d at 314 (citing *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000)) (finding the "unwelcome" element satisfied where plaintiff indicated to both management and his coworkers that he found the discriminatory conduct offensive). Further, Defendant acknowledged that some of Washenko's comments upset Plaintiff. *See* Answer ¶¶ 27, 37.

Nevertheless, Plaintiff has failed to establish that the alleged harassment was sufficiently severe or pervasive so as to create a hostile work environment Plaintiff fails to establish the objective severity of the harassment from the perspective of a reasonable person in the her position because most of Washenko's statements towards her, while distasteful, were references to and questions about Islam and Moroccan culture. One statement Defendant concedes could be construed as a negative race-based statement is Washenko's reference to individuals from Dubai

as "camel people." To constitute a severe or pervasive hostile work environment, however, the remarks must be more than stray isolated comments. *See Dockings v. Benchmark Commc'ns,* 176 F.3d 745, 748 (4th Cir. 1999). Here, none of Washenko's statements to Plaintiff rise to a level sufficiently severe or pervasive to alter "the conditions of [her] employment and create an abusive working environment." *See Oncale,* 523 U.S. at 78 (quoting *Forklift,* 510 U.S. at 21). Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's hostile work environment claim under § 1981 (Count II).

### 3.     Retaliation (Count III)

The Court GRANTS Defendant's Motion for Summary Judgment on Count III because Plaintiff has failed to demonstrate a genuine issue of material fact that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for retaliation under § 1981. Since Plaintiff does not offer any direct evidence of retaliation, the Court applies the *McDonnell Douglas* burden-shifting framework to evaluate her claim.

To establish a prima facie case for retaliation, a plaintiff must prove that (1) she engaged in a protected activity, (2) the defendant took an adverse employment action against her, and (3) a causal connection existed between the protected activity and the adverse employment action. *See Harris,* 499 Fed. App'x at 293 (citation omitted); *Sessions v. Montgomery Cnty. Sch. Bd.,* 462 Fed. App'x 323, 325 (4th Cir. 2012) (citation omitted); *Smith,* 202 F.3d at 248 (citations omitted).

In the context of a retaliation claim, a "protected activity" may fall into one of two categories: opposition and participation. *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 406 (4th Cir. 2005). Protected activity under the "participation clause" include "(1) making a charge;

(2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding or hearing under Title VII." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (citing 42 U.S.C.A. § 2000e-3(a)). Alternatively, protected activity under the "opposition clause" involves "an employee's verbal or written opposition to her employer's conduct which she believes is discriminatory." *Wainright v. Carolina Motor Club, Inc.*, No. 1:03-cv-01185, 2005 WL 1168463, at *10 (M.D.N.C. Apr. 27, 2005) (citing 42 U.S.C. § 2000e-3(a)).

First, Plaintiff engaged in protected opposition activity when she complained to Washenko about his racial comments on December 6, 2012 because she held a reasonable, good faith belief that the employment practice she opposed constituted racial discrimination. *See Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 340 (4th Cir. 2006); *see also Wainright*, 2005 WL 1168463, at *10 (citing *Laughlin*, 149 F.3d at 259) (finding that informal complaints of discrimination to management constitute protected oppositional activity). It is clear that Plaintiff had a subjective, good-faith belief that she was opposing unlawful discrimination. Plaintiff does not need to establish that the employment practices she opposed did in fact violate § 1981 in order to be protected. *Wainright*, 2005 WL 1168463, at *10 (finding that a plaintiff need not establish that the opposed employment practice violated an anti-discrimination law as long as her opposition was in good faith and objectively reasonable) (citation omitted).

Second, Defendant took an adverse employment action against Plaintiff when it terminated her employment. An adverse employment action is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry., Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted). Here, it is clear that a reasonable employee would be dissuaded from opposing

discrimination in the workplace if she believed that such oppositional conduct would result in her termination.

Third, the Court can infer causality from the temporal proximity between Plaintiff's protected activity and her subsequent termination. Retaliation claims must comport with a but-for causation analysis. *Univ. of Texas So. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013). Courts have inferred a causal link where a plaintiff has demonstrated a close temporal proximity between the time the employer learned about her protected activity and her termination. *See e.g., King*, 328 F.3d at 151 (ten-week period suffices to prove causal connection); *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (four months' time period establishes causal connection); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (three months' time period suffices to prove causal connection); *see also Zan Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (the but-for causation standard established in *Nassar* does not alter a plaintiff's ability to establish causation at the prima facie stage on summary judgment through temporal proximity). Here, Plaintiff argues that she was effectively terminated 75 minutes after she complained to Washenko when Alexander sent two emails to various employers inquiring about available positions for Plaintiff. The Court finds Plaintiff's contention unavailing as she continued working for Defendant for three months after her complaint. Nevertheless, a three-month time span between protected activity and termination establishes a causal link between Plaintiff's protected activity and her subsequent termination.

The burden then shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. Defendant has met its burden of production by alleging that Plaintiff was terminated because her position was eliminated due to lack of work. Although the first two prongs of the *McDonnell Douglas* burden-shifting framework are satisfied, Plaintiff has

not demonstrated a genuine issue of material fact that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for retaliation. Plaintiff does not offer any evidence that Defendant advertised, recruited or hired anyone to fill her former position which may show that the reason for her termination was a pretext. *See Reeves*, 530 U.S. at 143; *see also King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003) (affirming summary judgment because none of plaintiff's allegations contradicted employer's proffered discharge motive). Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claim under § 1981 (Count III).

## C.    Title VII

### 1.    Religion, National Origin, and Pregnancy Discrimination (Count IV)

#### a.    Religion and National Origin Claims

The Court GRANTS Defendant's Motion for Summary Judgment on Count IV as to Plaintiff's religion and national origin discrimination claims because Plaintiff has failed to demonstrate a genuine issue of material fact that Defendant's proffered reason for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for religion and national origin discrimination under Title VII. Since Plaintiff does not offer any direct evidence of discrimination, the Court applies the *McDonnell Douglas* burden-shifting framework to her claim.

To establish a prima facie case for discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she suffered from an adverse employment action; (3) at the time the defendant took the adverse employment action, she was performing her duties at a level that met the defendant's legitimate expectation; and (4) the position remained open or was filled by a

similarly qualified applicant outside of the protected class. *See McDonnell Douglas*, 411 U.S. at 802 (1973); *Harris*, 499 Fed. App'x at 291-92.

The Court finds that Plaintiff has established a prima facie case for religion and national origin discrimination. It is undisputed that Plaintiff is a member of a protected class, that her termination constitutes an adverse employment action, and that she was performing her duties satisfactorily at the time of her termination. In reduction of force cases, the fourth element can be satisfied by demonstrating that persons outside of the protected class were retained in the same positions or by producing evidence indicating that the employer did not treat the protected characteristic neutrally. *See Western*, 713 F.2d at 1015. Here, Plaintiff argues that members outside of the protected class were retained because Diaz and Berger, two non-Arab, non-Muslim, female employees, were retained and assumed her job assignments.

The burden then shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. The Court finds that Defendant has met its burden of production by alleging that Plaintiff was terminated because her position was eliminated due to lack of work. Although the first two prongs of the *McDonnell Douglas* burden-shifting framework are satisfied, Plaintiff has failed to prove by a preponderance of the evidence that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for discrimination. *See Reeves*, 530 U.S. at 143; *see also King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003) (affirming summary judgment because none of plaintiff's allegations contradicted employer's proffered discharge motive). Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's religion and national origin discrimination claims under Title VII (Count IV).

### b. Pregnancy Claims

The Court GRANTS Defendant's Motion for Summary Judgment on Count IV as to Plaintiff's pregnancy discrimination claim because Plaintiff has failed to demonstrate a genuine issue of material fact that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for pregnancy discrimination under Title VII. Since Plaintiff does not offer any direct evidence of discrimination, the Court applies the *McDonnell Douglas* burden-shifting framework to her claim.

To establish a prima facie case for pregnancy discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she suffered from an adverse employment action; (3) at the time the defendant took the adverse employment action, she was performing her duties at a level that met the defendant's legitimate expectation; and (4) the position remained open or was filled by a similarly qualified applicant outside of the protected class. *See McDonnell Douglas*, 411 U.S. at 802; *Harris*, 499 Fed. App'x at 291-92; *Notter v. N. Hand Prot.*, No. 95-1087, 1996 WL 342008, at *4 (4th Cir. 1996); *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005) (citation omitted).

The Court finds that Plaintiff has established a prima facie case of pregnancy discrimination. It is undisputed that Plaintiff is a member of a protected class, that her termination constitutes an adverse employment action, and that she was performing her duties satisfactorily at the time of her termination. In reduction of force cases, the fourth element can be satisfied by demonstrating that persons outside of the protected class were retained in the same positions or by producing evidence indicating that the employer did not treat the protected characteristic neutrally. *See Western*, 713 F.2d at 1015. Here, Plaintiff argues that members

outside of the protected class were retained because Diaz and Berger, non-Muslim female employees, were retained and assumed her job assignments.

The burden then shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. The Court finds that Defendant has met its burden of production by alleging that Plaintiff was terminated because her position was eliminated due to lack of work. Although the first two prongs of the *McDonnell Douglas* burden-shifting framework are satisfied, Plaintiff has failed to prove by a preponderance of the evidence that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for discrimination. *See Reeves*, 530 U.S. at 143; *see also King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003) (affirming summary judgment because none of plaintiff's allegations contradicted employer's proffered discharge motive). Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's pregnancy discrimination claims under Title VII (Count IV).

### 2.    Hostile Work Environment (Count V)

The Court GRANTS Defendant's Motion for Summary Judgment on Count V because the allegations supporting her hostile work environment claim are time-barred as they fall outside the statute of limitations period for Title VII claims. In a deferral state such as Virginia, a Title VII Charge must be filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged unlawful employment action. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007). Because Plaintiff filed her Charge with the EEOC on March 5, 2013, any alleged harassing conduct related to Plaintiff's hostile work environment claim that occurred before May 9, 2012, falls outside of the 300-day statute of

limitations and is therefore time-barred. Here, the last instance of harassing conduct Plaintiff alleges occurred in the winter of 2011.

Plaintiff argues that the continuing violation theory should apply to her claim because two of the discrete acts fall within the 300-day statutory period: (1) the removal of her assignments on November 2012, and (2) the day of her termination, March 1, 2013. The continuing violation theory enables a court to consider statements and acts beyond the 300-day period when at least one instance of harassing conduct occurred within that 300-day period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 (2002); *White v. BFI Waster Servs., LLC*, 375 F.3d 288, 292-93 (4th Cir. 2004). Discrete acts, however, are different from the hostile work environment claims included in the continuing violation theory. *Morgan*, 536 U.S. at 115. Discrete acts include, *inter alia*, termination, failure to promote, denial of transfer, and refusal to hire. *Id.* at 114. Because each discrete act constitutes a separate actionable unlawful employment practice, it "occurs" on the day that it "happened," and is therefore not actionable if time barred. *Id.* at 110, 113.

Conversely, a hostile work environment claim involves repeated conduct that "occurs over a series of days or perhaps years, and in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* at 115. Therefore, the harassing conduct involved in hostile work environment claims *collectively* form one "unlawful employment practice." *Id.*

Here, the two acts that Plaintiff references, i.e., the removal of her assignments on November 2012, and the day of her termination, March 1, 2013, are discrete acts because they each constitute a separate actionable unlawful employment practice, and therefore do not warrant the application of the continuing violation theory. Thus, the alleged acts supporting Plaintiff's

hostile work environment claim are time barred. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's hostile work environment claim under Title VII (Count V).

### 3. Retaliation (Count VI)

#### a. Religion and National Origin Claims

The Court GRANTS Defendant's Motion for Summary Judgment on Count VI as to Plaintiff's religion and national origin retaliation claims because Plaintiff has failed to demonstrate a genuine issue of material fact that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for religion and national origin retaliation under Title VII. Since Plaintiff does not offer any direct evidence of retaliation, the Court applies the *McDonnell Douglas* burden-shifting framework to her claim.

To establish a prima facie case for retaliation, a plaintiff must prove that (1) she engaged in a protected activity, (2) the defendant took an adverse employment action against her, and (3) a causal connection existed between the protected activity and the adverse employment action. *See Harris*, 499 Fed. App'x at 293 (citation omitted); *Sessions,* 462 Fed. App'x at 325 (citation omitted); *Smith*, 202 F.3d at 248 (citations omitted).

First, Plaintiff engaged in protected opposition activity when she complained to Washenko about his racial comments on December 6, 2012, because she held a reasonable, good faith belief that the employment practice she opposed constituted racial discrimination. *See Jordan*, 458 F.3d at 340; *see also Wainright*, 2005 WL 1168463, at *10 (citing *Laughlin*, 149 F.3d at 259) (finding that informal complaints of discrimination to management constitute protected oppositional activity). It is clear that Plaintiff had a subjective, good-faith belief that

32

she was opposing unlawful discrimination. Plaintiff does not need to establish that the employment practices she opposed did in fact violate § 1981 in order to be protected. *Wainright*, 2005 WL 1168463, at *10 (finding that a plaintiff need not establish that the opposed employment practice violated an anti-discrimination law as long as her opposition was in good faith and objectively reasonable) (citation omitted).

Second, Defendant took an adverse employment action against Plaintiff when it terminated her employment. An adverse employment action is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (2006) (internal quotation marks and citation omitted). Here, it is clear that a reasonable employee would be dissuaded from opposing discrimination in the workplace if she believed that such oppositional conduct would result in her termination.

Third, the Court can infer causality from the temporal proximity between Plaintiff's protected activity and her subsequent termination. Retaliation claims must comport with a but-for causation analysis. *Nassar*, 133 S.Ct. at 2533. Courts have inferred a causal link where a plaintiff has demonstrated a close temporal proximity between the time the employer learned about her protected activity and her termination. *See e.g., King*, 328 F.3d at 151 (ten-week period suffices to prove causal connection); *Carter*, 33 F.3d at 460 (four months' time period establishes causal connection); *Cerberonics*, 871 F.2d at 457 (three months' time period suffices to prove causal connection); *see also Zan Kwan*, 737 F.3d at 845 (the but-for causation standard established in *Nassar* does not alter a plaintiff's ability to establish causation at the prima facie stage on summary judgment through temporal proximity). Here, Plaintiff argues that she was effectively terminated 75 minutes after she complained to Washenko when Alexander sent two emails to another employer inquiring about available positions for Plaintiff. The Court finds

Plaintiff's contention unavailing as she continued working for Defendant for three months after her complaint. Nevertheless, a three-month time span between protected activity and termination arguably establishes a causal link between Plaintiff's protected activity and her subsequent termination.

The burden then shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. Defendant has met its burden of production by alleging that Plaintiff was terminated because her position was eliminated due to lack of work. Although the first two prongs of the *McDonnell Douglas* burden-shifting framework are satisfied, Plaintiff has failed to demonstrate a genuine issue of material fact that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for retaliation. *See Reeves*, 530 U.S. at 143; *see also King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003) (affirming summary judgment because none of plaintiff's allegations contradicted employer's proffered discharge motive). Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's religion and national origin retaliation claim under Title VII (Count VI).

### b. Pregnancy Claims

The Court GRANTS Defendant's Motion for Summary Judgment on Count VI as to Plaintiff's pregnancy retaliation claim because Plaintiff cannot demonstrate that (1) she engaged in protected activity with respect to her pregnancy, (2) she was treated differently due to her pregnancy, and (3) she was terminated because she took maternity leave. Further, even if Plaintiff could establish a prima facie case for pregnancy retaliation, she has failed demonstrate a genuine issue of material fact that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its

true reason, but rather a pretext for pregnancy retaliation under Title VII. Since Plaintiff does not offer any direct evidence of retaliation, the Court applies the *McDonnell Douglas* burden-shifting framework to her claim.

To establish a prima facie case for retaliation, a plaintiff must prove that (1) she engaged in a protected activity, (2) the defendant took an adverse employment action against her, and (3) a causal connection existed between the protected activity and the adverse employment action. *See Harris*, 499 Fed. App'x at 293 (citation omitted); *Sessions,* 462 Fed. App'x at 325 (citation omitted); *Smith*, 202 F.3d at 248 (citations omitted).

The Court finds that Plaintiff has failed to establish a prima facie case for pregnancy retaliation. Plaintiff argues that she engaged in protected activity during her discussion with Washenko in July 2012, regarding her taking maternity leave. To be protected oppositional conduct, however, Plaintiff must have opposed conduct by her employer. *See Wainright*, 2005 WL 1168463, at *10 (citing *Laughlin*, 149 F.3d at 259). Here, Plaintiff was granted three months of maternity leave and informed that it would be unpaid. Plaintiff has also failed to establish a causal link in the eight-month gap between her alleged protected activity and her termination.

Even if Plaintiff could establish a prima facie case of pregnancy retaliation, Defendant has met its burden of producing a legitimate, non-discriminatory reason for Plaintiff's termination by alleging that Plaintiff's position was eliminated due to lack of work. Plaintiff has failed to demonstrate a genuine issue of material fact that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for retaliation. *See Reeves*, 530 U.S. at 143; *see also King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003) (affirming summary judgment

because none of plaintiff's allegations contradicted employer's proffered discharge motive). Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's pregnancy retaliation claim under Title VII (Count VI).

## IV.    CONCLUSION

The Court GRANTS Defendant's Motion for Summary Judgment for three reasons. First, Defendant's Motion for Summary Judgment as to Counts I, III, IV, and VI under Title VII and § 1981 are granted because Plaintiff has failed to demonstrate a genuine issue of material fact that the legitimate reason offered by Defendant for terminating Plaintiff's employment—the elimination of Plaintiff's position due to lack of work—was not its true reason, but rather a pretext for discrimination or retaliation. Second, Defendant's Motion for Summary Judgment as to Count II under § 1981 is granted because only one of Greg Washenko's statements can be construed as a racially derogatory comment and Plaintiff cannot establish that one derogatory comment created an environment sufficiently severe or pervasive to alter the conditions of her employment. Finally, Defendant's Motion for Summary Judgment as to Count V under Title VII is granted because the allegations supporting Plaintiff's hostile work environment claim are time barred as they fall outside the statute of limitations period for Title VII claims.

For the foregoing reasons, it is hereby

**ORDERED** that Defendant Fairview Property Investments LLC's Motion for Summary Judgment (Doc. 27) is **GRANTED**, and this case is **DISMISSED**.

**IT IS SO ORDERED.**

ENTERED this 16th day of December, 2014.

Alexandria, Virginia

12 /16/ 2014

_____/s/_____

Gerald Bruce Lee
United States District Judge

36